```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/29/2016
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
  M.T. and T.W.-S, individually and on behalf of   :
  H.T., a minor,                                         :
                                               :
                          Plaintiffs,  :             1:14-cv-10124-GHW
                                            :
                    -v -             :        MEMORANDUM OPINION
                                            :         AND ORDER
THE NEW YORK CITY DEPARTMENT OF     :
EDUCATION,                                :
                                            :
                         Defendant.  :
------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

      Plaintiffs M.T. and T.W.-S., (together, "Parents") individually and on behalf of their

daughter H.T., bring this action against the New York City Department of Education ("DOE")

under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA").  The

Parents contend that the DOE denied H.T. a free and appropriate public education ("FAPE") for

the 2010-2011 school year, and that they are therefore entitled to reimbursement for the cost of

H.T.'s tuition at the private school she attended during that school year.  The parties have cross-

moved for summary judgment.  For the reasons below, the Court finds that H.T. was offered a

FAPE for the 2010-2011 school year.  Therefore, the DOE's cross-motion for summary judgment,

Dkt. 24, is GRANTED, and the Parents' motion for summary judgment, Dkt. 19, is DENIED.

## I.  Background

### A.  Statutory Framework and the IDEA Administrative Process

      Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  The IDEA requires that states

that receive federal education funding to provide children with disabilities with a FAPE.  20 U.S.C.

§ 1412(a)(1)(A); *see also R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012)

(citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child."  *R.E.*, 694 F.3d at 175 (citing 20 U.S.C. § 1414(d); *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002)).[1]

An IEP includes "the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives."  *Id.* (quoting *D.D. ex rel. V.D. v. New York City Bd. of Educ.*, 465 F.3d 503, 507-08 (2d Cir. 2006)).  An IEP must be "reasonably calculated to enable the child to receive educational benefits," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982), but need not provide "everything that might be thought desirable by loving parents."  *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 132 (2d Cir. 1998) (citation omitted).

New York has assigned responsibility for developing IEPs to local Committees on Special Education ("CSEs").  N.Y. Educ. Law § 4402(1)(b)(1).  Each CSE must include the parents of the student in question, a regular or special education teacher, a school psychologist, a district representative, and a parent representative, among others.  N.Y. Educ. Law § 4402(1)(b)(1)(a).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program."  *R.E.*, 694 F.3d at 175 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).

---

[1] As has been done in other IDEA cases, the Court finds it useful to supply a list of the acronyms used in this opinion. *See M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012).
BIP – behavior intervention plan
CSE – committee on special education
FAPE – free appropriate public education
FBA – functional behavioral assessment
FNR – final notice of recommendation
IDEA – Individuals with Disabilities Education Act
IEP – individualized education program
IHO – impartial hearing officer
RSA – related service authorization
SRO – state review officer

If a parent believes that the school district has failed to provide a FAPE, "the parent may unilaterally place their child in a private school at their own risk and seek financial reimbursement." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10 (1993)).  To seek reimbursement, the parent must file a due process complaint with the DOE, which initiates an administrative process beginning with a hearing before an impartial hearing officer ("IHO").  *Id.* (citing 20 U.S.C. § 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  The administrative proceeding is governed by the "*Burlington/Carter*" test, under which "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them."  *Id.* (citation omitted).

After the IHO renders a decision, either party may appeal the decision to a state review officer ("SRO").  N.Y. Educ. Law § 4404(2).  An SRO's decision is the final administrative decision, but if a party is dissatisfied with the SRO's decision they may challenge the decision in federal court. 20 U.S.C. § 1415(i)(2)(A).

### B. H.T.'s 2010-2011 IEP and Unilateral Placement

H.T. was born in 1996, and was fourteen years old at the beginning of the 2010-2011 twelve-month school year.  MT1284 ("2010-11 IEP").[2]  She has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety disorder not otherwise specified, expressive and receptive language disorder, non-verbal learning disorder, and multiple developmental delays. MT1001; 2010-2011 IEP at 4.  H.T. is anxious and easily overwhelmed and distracted, has difficulty with self-control, and when she becomes emotionally dysregulated she may yell, hit herself, or exhibit other behaviors that interfere with her ability to learn.  MT0619-21, 743.  H.T.'s cognitive

---

[2] In accordance with this Court's February 20, 2015 order, the administrative record in this case was Bates-stamped and filed under seal pursuant to Federal Rule of Civil Procedure 5.2(d).  *See* Dkt. 15.  References to "MT" Bates-stamped documents are references to the sealed administrative record.

testing indicates scores ranging between average and borderline.  2010-11 IEP at 4.  During the 2009-2010 school year, H.T. attended the Rebecca School ("Rebecca"), a private school for children "from 4-to-21-years-old with neurodevelopmental disorders of relating and communicating, including PDD [pervasive developmental disorder] and autism."  MT1347.

The CSE met on April 29, 2010 to develop H.T.'s IEP for the 2010-2011 school year.  2010-11 IEP.  The CSE consisted of M.T. (H.T.'s mother), Feng Ye (special education teacher and district representative), Rose Fochetta (school psychologist), Carmen Garcia (parent representative), Gwen Levine (social worker from Rebecca), and Megan Merwin (H.T.'s teacher at Rebecca).  2010-2011 IEP at 2; MT0276-77; MT1591 ("CSE Minutes").

At the meeting, the CSE discussed H.T.'s current academic performance and behavioral needs.  CSE Minutes.  Ms. Merwin did not feel comfortable labeling aspects of H.T.'s performance by grade level (i.e., "reading at third-grade level") but she did describe H.T.'s academic development in specific terms (e.g., H.T. was working on performing addition without regrouping).  *Id.*  The minutes state that the CSE reviewed H.T.'s 2009-2010 academic goals to determine which had been met, which were ongoing, and which goals would be appropriate to add to the 2010-2011 IEP.  *Id.* A goal regarding H.T.'s ability to identify measurements was added to the math section at M.T.'s suggestion.  *Id.*  The CSE also spent approximately half an hour discussing circumstances that triggered dysregulation for H.T., her interfering behaviors, and strategies for addressing these behaviors—all of which was memorialized in a behavior intervention plan ("BIP") appended to the IEP.  *Id.*; 2010-11 IEP at 19.

The IEP recommended that H.T. be placed in a specialized school in a special class with a student-teacher-paraprofessional ratio of 8:1:1 for the upcoming twelve-month school year.[3]  2010-2011 IEP at 1.  In addition, the IEP recommended that H.T. have a dedicated crisis management

---

[3] A "special class" is a class in which all of the students are children with disabilities, and a "specialized school" is a school that educates only students with disabilities.

paraprofessional to support her during the school day, and that she receive related services of occupational therapy (individually, three times per week), counseling (individually, once a week, and in a group of three, twice per week), and speech language therapy (individually, once a week, and in a group of three, twice per week).  2010-2011 IEP at 17.

On June 11, 2010 the DOE sent a Final Notice of Recommendation ("FNR") to H.T.'s parents recommending H.T.'s placement at PS035, the Manhattan School ("PS 35"), with the IEP-mandated related services.  MT1590.

On June 18, 2010, after receiving the FNR, M.T. visited PS 35 with Rebecca's Ms. Levine. MT0957, 1278.  They concluded that PS 35 was not an appropriate placement for H.T. because she would have difficulty remaining regulated in such a large school where many of the students have behavioral issues. MT1278.  M.T. was particularly concerned about the presence of security guards and the need for H.T. to pass through metal detectors in the morning, because H.T. could associate the security guards with dangerous situations, which in turn could heighten her anxiety.  *Id.*

On June 21, 2010, M.T. wrote to the CSE and explained that she did not feel that PS 35 was an appropriate placement for H.T. and that she planned to continue to send her to Rebecca and seek tuition reimbursement.  *Id.*  In addition to the issues discussed above, M.T. expressed her concern that H.T. would not receive all of the related services mandated by her IEP, particularly occupational therapy, and noted that the school did not have a dedicated room for occupational therapy or a sensory gym.  MT1279.  She also requested additional information regarding the other students who would be in H.T.'s class and information about the classroom teacher's credentials.  MT1279-80. M.T. stated that she would reassess her decision if the CSE could address her concerns and provide her with additional information.  MT1280.

The DOE did not respond to M.T.'s letter, and H.T. continued to attend Rebecca from the beginning of the twelve-month school year beginning in July 2010.  M.T.'s contract with Rebecca provided that H.T. could withdraw from the school on or before September 7, 2010.

On September 22, 2010, M.T. revisited PS 35 with H.T.'s then-classroom social worker from Rebecca.  MT0977.  This second visit did not assuage any of her concerns.  On October 5, 2010, M.T. again wrote to the CSE, reiterating her view that PS 35 was not an appropriate placement for H.T.  MT1275.  In this second letter, M.T. mentioned that she had been told that PS 35 "discourages one-on-one paras since a goal of the school is to foster independence," and that she was concerned that H.T. would be viewed negatively by other students because of her need for a paraprofessional.  MT1276.

H.T. attended Rebecca for the remainder of the 2010-2011 school year.

## C. Administrative Proceedings

On July 15, 2011, M.T. filed a due process complaint with the DOE and requested a hearing before an IHO.  MT1265.  The due process complaint alleged that H.T.'s 2010-2011 IEP was deficient because it did not fully describe H.T.'s needs and behaviors, it contained insufficient goals, and the CSE had failed to perform a functional behavioral assessment ("FBA"), resulting in an insufficient BIP.  MT1265-70.  The due process complaint also detailed the concerns M.T. had regarding H.T.'s proposed placement at PS 35 after visiting the school.  *Id.*  IHO Ellen Cutler-Igoe heard seven non-consecutive days of testimony from fourteen witnesses between October 24, 2011 and May 30, 2010, and received more than three dozen documents into evidence.  *See* MT0048-50.

The IHO found that DOE had offered H.T. a FAPE for the 2010-2011 school year.  Her decision stated that she was not persuaded that the IEP "was procedurally or substantively flawed," and that the IEP and the teacher assigned to the proposed placement classroom would have allowed H.T. to progress academically.  MT0045-46.

M.T. and T.W.-S. appealed.  SRO Justyn Bates sustained the IHO's decision that H.T. was offered a FAPE.[4]  The SRO agreed with the IHO that H.T.'s 2010-2011 IEP was both procedurally

---

[4] Before the IHO and SRO, the Parents also argued that H.T. was entitled to an Independent Educational Evaluation ("IEE").  They requested an IEE in 2010, but were concerned that the DOE evaluator who contacted them would not

and substantively adequate, and concluded that the Parents' challenge to H.T.'s recommended placement at PS 35 was impermissibly speculative, but, even in the alternative, the evidence did not show that placement at PS 35 would have denied H.T. a FAPE.  MT0001-27 ("SRO Decision").

On December 24, 2014, the Parents filed this lawsuit, and on May 18, 2015 they moved for summary judgment.  The DOE cross-moved for summary judgment on June 11, 2015.

## II.  Standard of Review

Summary judgment in an IDEA case "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions."  *R.E.*, 694 F.3d at 184 (citing *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)).  "The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence."  *Hardison v. Bd. of Educ. of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385-86 (2d Cir. 2014) (citing *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.ed 186, 191-92 (2d Cir. 2005)).

Although a district court must conduct its own review of the record, it should give due weight to administrative proceedings, mindful that "the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *R.E.*, 694 at 184 (citing *A.C. ex rel. M.C.*, 553 F.3d at 171).  The Second Circuit recently provided additional guidance regarding the deference owed to administrative findings in *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217 (2d Cir. 2012).  Although it declined to adopt a bright-line rule,

---

be impartial and requested an alternative evaluator.  M.T. Br. at 12-13.  The IHO found that the M.T. "knowingly and intentionally declined the DOE's offer to perform testing" when she requested a different evaluator.  IHO Decision at 17.  The SRO reversed the IHO, holding that because the DOE had failed to provide M.T. with a list of independent evaluators it was permissible for M.T. to reject the evaluator selected by DOE.  SRO Decision at 24.  The SRO concluded that the Parents were entitled to select an evaluator to conduct an IEE from a list of independent evaluators provided by the district.  *Id.*  The Court notes that the DOE does not contest this conclusion on appeal, and in any event finds the SRO's well-reasoned decision on this point to be persuasive.  Further, the Court notes that H.T., who was fourteen years old at the time of the April 29, 2010 CSE meeting, is now about to turn twenty.  The DOE is charged with providing a FAPE to all students with disabilities between the ages of three and twenty-one who reside in New York City.  N.Y. Educ. Law. § 4402.  If for any reason the IEE requested by the Parents and ordered by the SRO has not yet taken place, the Court hopes that it will take place as soon as possible.

the *M.H.* court explained that "the standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless[ ] falls well short of complete *de novo* review . . . .'" *Id.* at 244 (citing *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086-87 (1st Cir. 1993)).  "Determinations that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed or whether objective indications of a student's progress exist." *F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 578 (S.D.N.Y. 2013) (citing *M.H.*, 685 F.3d at 244).

Where, as here, the district court's "review is based entirely on the same evidence as that before the SRO," the court should "afford more deference" to the SRO's decision.  *M.H.*, 685 F.3d at 244.  Moreover, district courts give more deference to administrative proceedings when the IHO and SRO are in agreement.  *S.E. v. New York. City Dep't of Educ.*, 113 F. Supp. 3d 695, 709 (S.D.N.Y. 2015) (finding that the state educational decisions were entitled to deference where "there [was] no divergence" between the IHO and SRO decisions and the district court's review was "based entirely on the same evidence as that before the SRO."); *B.K. v. New York City Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court.").

"In sum, judicial review of administrative decisions under the IDEA requires the court (1) to conduct an independent review of the administrative record, (2) use a preponderance of the evidence standard, and (3) give deference to the administrative determinations, particularly that of the SRO."  *S.E.*, 113 F. Supp. 3d at 706 (internal quotation marks and citations omitted).

## III.  Discussion

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is first, procedural, and second, substantive."  *R.E.* 694 F.3d at 189-90.  "Substantive inadequacy automatically entitles the parents to reimbursement.  Procedural violations, however, only do if they

'impeded the child's right to a FAPE,' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'" *Id.* at 190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii); *A.C. ex rel. M.C.*, 553 F.3d at 172). In addition to challenging the IEP, parents may also prospectively challenge a proposed placement school's capacity to implement a child's IEP. *See M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 244-45 (2d Cir. 2015). H.T.'s parents contend that her 2010-2011 IEP was both procedurally and substantively inadequate, and that the proposed placement at PS 35 could not implement the services required by the IEP.

### A. Burden of Proof

Before beginning its analysis of the IEP, the Court will address the Parents' argument that the IHO erred by "inappropriately shifting the burden to Plaintiffs to demonstrate the inappropriateness" of the IEP and placement offered by DOE. M.T. Br. at 13. As set forth above, under the *Burlington/Carter* framework, the burden is on the DOE to establish that it offered the child a FAPE. *M.W.*, 725 F.3d at 135. If the DOE fails to do so, the burden then shifts to the parents at the second step to prove that their selected placement was appropriate. *Id.*

Here, the IHO determined that DOE had offered H.T. a FAPE, and so it was analytically unnecessary to reach the second step of the *Burlington/Carter* test. Despite this, the IHO—confusingly—wrote that it did "not find that the parents met their burden of proof for reimbursement towards tuition of the Rebecca School." IHO Decision at 17. This statement could be read two ways: (1) that the IHO did not find that the parents met their overall burden under the *Burlington/Carter* framework to show that they were entitled to reimbursement, or (2) that, as the Parents argue, the IHO mistakenly put the burden of proof on the Parents in analyzing step one of the *Burlington/Carter* test. In his review of the IHO decision, the SRO acknowledged that the IHO "may have used less than optimal language," but concluded that a complete review of the record showed that "the IHO properly placed the burden on the district to prove that it offered the student

a FAPE." SRO Decision at 10.  The SRO also noted that during the impartial hearing the parties

agreed that the DOE had the burden of proof to demonstrate that it offered a FAPE.  *Id.* (citing

MT0780-81).

Most importantly, however, the SRO explicitly stated that even "assuming for the sake of

argument that the IHO misapplied the burden of proof, I have nevertheless independently examined

the hearing record and . . . I find the evidence favoring the district is sufficient to support the IHO's

ultimate determination that the district offered the student a FAPE." *Id.* The SRO's decision—over

twenty-four well-reasoned single-spaced pages—merits this Court's deference on all but one issue,

where the law has developed since the time of his decision, as explained below.  Furthermore, after

conducting its own independent review of the record,[5] this Court is both not convinced that the

IHO misapplied the burden of proof, and is also certain that any error on the part of the IHO was

cured by the SRO's careful, independent review.  It is the SRO's review, the "final decision of the

state authorities," upon which the Court will rely in analyzing the parties' motions.  *See R.E.*, 694

F.3d at 189 (explaining that when the decisions of the IHO and SRO conflict the district court

should generally defer to the SRO).

## B.  Procedural Adequacy of the IEP

M.T. and T.W.-S. assert that the IEP was procedurally inadequate because the CSE failed to

provide M.T. the opportunity to contribute meaningfully during the April 29, 2010 meeting, failed to

consider sufficient evaluative material in developing the IEP, and failed to fully evaluate H.T. by not

performing a formal FBA prior to the meeting.  The Court evaluates each of the alleged

inadequacies individually and in the aggregate, mindful that "[m]ultiple procedural violations may

---

[5] The Court will take this opportunity to note that there are some minor errors in the record in this matter.  In particular, page 343 and 523 of the impartial hearing transcript were omitted (the transcript skips from page 342 (marked MT0493) to 344 (MT0494) and from page 522 (MT0682) to 524 (MT0683).  Additionally, page 347 of the hearing transcript is included twice (MT0497-98).  Having had the benefit of the parties' papers, the SRO's decision, and the other 1691 pages of the record, the Court is comfortable that these minor omissions would not affect its decision in this matter, and mentions them only for the sake of completeness.

cumulatively result in the denial of a FAPE even if the violations considered individually do not."
*R.E.*, 694 F.3d at 190 (citing *Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005)).

### M.T.'s Participation in the April 29, 2010 Meeting

The IDEA guarantees parents the right "to participate in meetings with respect to the identification, evaluation, and educational placement" of their child.  20 U.S.C. § 1415(b)(1). Although parents have a right to participate in this process, they do not hold veto power over decisions with which they disagree.  *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir. 2009).  Here, there is no suggestion that M.T. or the Rebecca participants who attended the CSE meeting were excluded from participation, or that they voiced any disagreement with the IEP during the meeting.

The SRO determined that the record "reflects meaningful and active parental participation as well as participation from the Rebecca School staff," SRO Decision at 11, and the Court agrees with that assessment.  The minutes taken during the April 29, 2010 CSE meeting show that M.T. was asked for her opinion multiple times, and specifically note that M.T. contributed to the development of the IEP by adding a goal for measurement in math and reviewing and agreeing with specific portions of the IEP, including the description of H.T. social/emotional performance. MT0298; CSE Minutes.  M.T. also spoke about H.T.'s improvement in certain academic areas.  CSE Minutes.  Further, as the SRO noted, the district representative, Ms. Ye, testified that two representatives from Rebecca—H.T.'s teacher and classroom social worker—actively participated in the development of the IEP.  MT0278-279.  The IEP also reflects a discussion among the CSE participants regarding the appropriate student-teacher ratio for H.T.'s placement—that a 12:1:1 class would be too large for H.T. and a 6:1:1 class would be too restrictive.  2010-11 IEP at 16.  Ms. Ye testified that the members of the CSE agreed that 8:1:1 was the proper fit for H.T.  MT0308.

The Parents, in their brief, claim that the IHO and SRO improperly failed to credit Ms. Levine's testimony, which they claim contradicted Ms. Ye's testimony and the meeting minutes. M.T. Br. at 17-18.  But the Parents mischaracterize Ms. Levine's testimony.  She did not testify that she disagreed with the 8:1:1 recommendation during the meeting or that an informal FBA did not take place.  What the record actually reflects is Ms. Levine's testimony that she only recalls the meeting "vaguely" because she does "a lot of these," and that she did not recall doing an FBA at the table or whether she was asked if she agreed with the 8:1:1 ratio.  MT0950-51.

There is no suggestion that M.T. or the Rebecca participants were denied the opportunity to participate.  To the contrary, the record demonstrates that they were afforded that opportunity and that they actively participated in the meeting and the formulation of the 2010-2011 IEP.

### *Sufficient Evaluative Materials Were Considered*

The IDEA requires a CSE to "review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers . . . ."  20 U.S.C. § 1414(c)(1)(A).  In developing H.T.'s 2010-2011 IEP, the CSE relied upon her 2009-2010 IEP, a December 2009 Rebecca progress report, and a December 2009 classroom observation performed by the DOE school psychologist.  MT0280, 287.  The SRO concluded, and the record shows, that these documents were thoughtfully considered, together with input from the members of the CSE, to develop H.T.'s 2010-2011 IEP.  SRO Decision 12-15.

The Parents argue that the CSE should have considered additional materials, and complain that the December 2009 progress report and classroom observation were completed "many months" before the April 2010 CSE.  M.T. Br. at 15.  As an initial matter, the Court disagrees that the classroom observation and progress report, less than five months old at the time of the CSE meeting, were outdated.  Rebecca creates two progress reports for each student each year—one in May, and one in December.  MT0285.  At the April 2010 CSE meeting, the December 2009

progress report was the most recent report available.  The Court observes that M.T. and H.T.'s teacher from Rebecca participated in the CSE, and, as noted above, made specific contributions to the deliberations of the CSE.  Furthermore, despite their assertion that the CSE "failed to review or consult" various assessments, the Parents point to no documents that were provided to the CSE— or that they informed the CSE that it should consider—that were ignored.  M.T. Br. at 5.  Similar collections of evaluative materials routinely withstand challenges of procedural adequacy, and do so again here.  *See, e.g., R.B. v New York City Dep't of Educ.*, 589 F. App'x 572, 575 (2d Cir. 2014) (2009 progress report from the Rebecca School, the student's 2009-2010 IEP, and  November 2009 classroom observation by DOE were sufficient data to be used in drafting a 2010-2011 IEP); *F.B. v. New York City Dep't of Educ.*, 923 F. Supp. 2d 570, 580-81 (S.D.N.Y. 2013) (holding that a 2009-2010 IEP, a November 2009 classroom observation, a December 2009 Rebecca progress report, and a physical therapy evaluation were sufficient, and noting that the Rebecca progress report "in turn describes [the student's] functioning and goals, based on the input of his classroom teacher, occupational therapist, physical therapist, speech-language pathologist, and music and art therapists.").

### The Informal FBA

New York law requires CSEs to conduct FBAs "for students who engage in behaviors that impede learning."  *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014) (citing N.Y.C.R.R. §§ 200.1(r), 200.4(b)(1)(v), 200.22(a)).  If a student engages "in behaviors that impede learning despite consistent interventions" the CSE "shall consider the development of a behavioral intervention plan," to address the behavior and identify intervention strategies.  *Id.* at 72-73 (internal quotation marks and citations omitted).

"The failure to conduct an adequate FBA is a serious procedural violation because it may prevent the CSE from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E.* 694 F.3d at 190.  Failure to

conduct an FBA is not *per se* denial of a FAPE, "but when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors." *Id.* (citing *A.C. ex rel. M.C.*, 553 F.3d at 172). To evaluate whether the alleged procedural deficiency denied H.T. a FAPE, therefore, the finder of fact must examine whether the IEP adequately described H.T.'s behaviors and set forth a plan to address them.

In this case, it is undisputed that there was no formal, written FBA conducted prior to the April 29, 2010 CSE meeting. The SRO concluded that, despite the lack of a formal FBA, the IEP and BIP developed during the CSE meeting appropriately addressed H.T.'s behaviors. The SRO cited Ms. Ye's explanation that an informal discussion during the CSE meeting was sufficient in this case because H.T.'s behavior was "pretty much established," and the CSE was already familiar with her patterns of behavior. SRO Decision at 19; MT0161. The Court notes that the CSE meeting minutes also indicate that there was a full discussion of H.T.'s behaviors and appropriate strategies to address them. CSE Minutes ("FBA developed at the table w/ Rebecca staff's (teacher and SW) input. BIP reviewed and revised at the table w/ school aid / parent's input (discussion lasted from 9:40 to 10:08)."). The Court's concurs with the SRO's well-considered conclusion that "the April 2010 CSE had sufficient information to accurately identify the student's behaviors that seriously interfered with her ability to engage in instruction." SRO Decision at 19.

Having decided that the CSE had the necessary information regarding H.T.'s behaviors, the next question is whether these behaviors were adequately addressed by the BIP. The SRO concluded that H.T.'s behaviors were appropriately addressed, not only in the BIP (which contained specific strategies and benchmarks to determine whether the strategies were effective), but also throughout the IEP which mandated additional services for H.T. based on her behaviors, and made detailed recommendations to address her behaviors including providing H.T. with access to a quiet environment, visual cues to assist in maintaining regulation, and presenting her with choices for self-

regulating activities.  SRO Decision at 19; 2010-11 IEP.  After reviewing the record, the Court agrees with the SRO's well-reasoned determination.

The Parents argue that the BIP was inaccurate because it stated that H.T. would throw objects, when H.T.'s 2010-2011 classroom teacher never observed this behavior.  M.T. Br. at 20. But the Parents ignore the fact that the BIP was written based on H.T.'s behavior *prior to* the 2010-2011 school year, and that the remainder of the description of H.T.'s behavior when dysregulated was corroborated.  MT0684, 743.  The strategies described to address these behaviors—preparing H.T. in advance for changes in routine, providing options for appropriate responses, and co-regulation with an adult—were positive behavioral interventions that H.T.'s teachers and service providers testified were effective.  MT0633, 745-46; 20 U.S.C. § 1414(d)(3)(B)(i) ("[t]he IEP team shall . . . consider the use of positive behavioral interventions and supports").

In sum, the Court finds that M.T. had the opportunity to—and did—participate meaningfully in the development of H.T.'s IEP, that the CSE considered sufficient evaluative materials, and that the lack of a formal FBA did not deprive H.T. of a FAPE because the CSE had adequate information about her behavior and formulated an appropriate BIP.

### B.  Substantive Adequacy of the IEP

Having concluded that the April 29, 2010 IEP was procedurally adequate, the Court turns to the Parents' arguments that it was substantively inadequate.  "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'"  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998)).  "A school district is not, however, required to furnish 'every special service necessary to maximize each handicapped child's potential.'" *Id.* (quoting *Rowley*, 458 U.S. 172, 199(1982)).

The IEP's description of H.T.'s interfering behaviors and the BIP were discussed above, so the Court will turn now to the Parents' argument that the IEP failed to accurately describe H.T.'s levels of performance and failed to include appropriate goals and short term objectives.  M.T. Br. at 19.

The SRO considered the Parents' assertion that the IEP contained insufficient information about H.T.'s performance in its discussion of the evaluative materials considered by the CSE.  SRO Decision 12-15.  The Court agrees with the SRO's assessment that the "narrative descriptions" of H.T.'s academic capabilities and "specific descriptions" of her social/emotional performance were adequate.  SRO Decision at 14.

The IEP described H.T.'s abilities based on information provided by her then-classroom teacher.  MT0279.  Because the teacher was not comfortable providing grade-level assessments, the IEP contained specific statements such as H.T. "is able to write simple sentence [sic] related to fairy tales" and "is able to add double-digit numbers without regrouping with manipulative [sic]."  MT0288-89; 2010-11 IEP at 3.  The IEP also explained that although H.T. "is able to remain regulated for the majority of the school day," during times of excitement or unpredictability she would struggle and "may yell loudly, pound her hands on furniture, or grab others."  2010-11 IEP at 4.

With respect to goals, "the April 2010 IEP included approximately 16 annual goals and approximately 42 short-term objectives" targeting HT's reading, writing, math, OT, speech-language, and counseling needs.  SRO Decision at 16; 2010-11 IEP.  The SRO carefully evaluated each individual area's goals and found them to be "sufficiently detailed and measurable" and that they "addressed the student's identified areas of need."  SRO Decision 17.  "The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003).  The SRO's decision on this point was particularly thorough, canvassing H.T.'s goals in

each relevant area and evaluating the level of adult involvement anticipated and the means by which progress would be measured.  SRO Decision at 16-17.  Moreover, the SRO's conclusion is bolstered by this Court's review of the record, which shows that the educators and service providers who worked with H.T. at the Rebecca School testified that the goals in the 2010-2011 IEP were appropriate for her.  MT0735-36, 850-58, 1112, 1191-93.

The Court is unpersuaded by the Parents' argument that Mr. Cancel, a PS 35 social worker, testified that he would have added additional goals and conducted an FBA.  M.T. Br. at 6.  First, Mr. Cancel did not testify that the goals in the IEP were insufficient; he testified that would have "follow[ed] the goals mandated by the IEP," and would also have "add[ed] the immediate goals that the student might have" as she transitioned to a new school environment.  MT0187.  Additionally, Mr. Cancel did *not* testify that he would have needed to conduct an FBA of H.T. due to any shortcomings in her existing BIP.  He testified, in response to a general question about how and when he conducts FBAs, that for students he worked with at PS 35 that he generally conducted an FBA in conjunction with their annual IEP meeting.  MT0245.

To the extent that the Parents protest that the goals were inadequate because they were consistent with the goals in the December 2009 progress report, the Court notes, as other courts in this district have noted, that there is "no authority for the proposition that drawing goals from a teacher's progress report is a violation of the [applicable law] or regulations." *R.B. v. New York City Dep't of Educ.*, No. 12-cv-3763-AJN, 2013 WL 5438605, at *13 (S.D.N.Y. Sept. 27, 2013) (quoting *A.M. ex rel. Y.N. v. New York City Dep't of Educ.*, No. 12-cv-5573-JMF, 2013 WL 4056216 (S.D.N.Y. Aug. 9, 2013)).

Having concluded that the IEP was both procedurally and substantively adequate, the Court next addresses the Parents' contention that H.T. was denied a FAPE on the basis of the DOE's proposed placement school, PS 35.

### C.  Proposed Placement at PS 35

The Parents' final argument is that the proposed placement school, PS 35, was not capable of implementing H.T.'s IEP, and that, therefore, the DOE failed to offer H.T. a FAPE.  M.T. Br. at 20.

In *R.E. v. New York City Department of Education*, the Second Circuit held that "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  694 F.3d at 195.  The *R.E.* court also held that evidence that the school district did not follow the IEP as written cannot be used retrospectively to "show that [the IEP] was deficient from the outset," but that such evidence "might be relevant in a later proceeding to show the child was denied a FAPE because necessary services included in the IEP were not provided in practice."  *Id.* at 187 n.3.

After the Second Circuit decided *R.E.* in September 2012, a split developed among district courts in this Circuit as to whether *R.E.* barred as speculative all claims in which the student never attended the recommended placement, or whether plaintiffs could still prevail on some prospective objections to a proposed placement school.  *Compare P.S. v. New York City Dep't of Educ.*, No. 13-cv-6709-LGS, 2014 WL 3673603, at *13 (S.D.N.Y. July 24, 2014) ("a challenge to the DOE's choice of school is improper where the student never attended the school") *with Scott ex rel. C.S. v. New York City Dep't of Educ.*, 6 F. Supp. 3d 424, 444-45 (S.D.N.Y. 2014) (characterizing parent's challenge as "prospective, not speculative" when she was told that her child would be placed in a 6:1:1 class at the proposed school instead of the 12:1:1 class required by the IEP).

The SRO, deciding this case in August 2014, concluded that the Parents' claims were impermissibly speculative because "the parents rejected the assigned public school site . . . prior to the time the district became obligated to implement the April 2010 IEP."  SRO Decision at 22. However, the SRO went on to say that that:

> [E]ven assuming for the sake of argument that the parents could make such speculative claims or that the student had attended the district's recommended program at the assigned public school site, the evidence does not support the finding that the district would have violated the FAPE legal standard related to IEP implementation—that is, that the district would have deviated from the student's IEP in a material or substantial way.

SRO Decision at 22-23 (citation omitted).

After the SRO's decision, and after the briefing on this motion concluded, the Second Circuit decided *M.O. v. New York City Department of Education*, 793 F.3d 236 (2d Cir. 2015), in which it directly addressed the question of whether *R.E.* precluded all prospective challenges to proposed placements. *M.O.* expressly did not overrule *R.E.*, instead, it offered a "clarification" of its scope. *See id.* at 244 ("we find it necessary to clarify the proper reach of our holding in *R.E.*").

The panel in *M.O.* explained that "*R.E.* does not foreclose *all* prospective challenges to a proposed placement school's capacity to implement a child's IEP . . . ." *Id.* at 244 (emphasis added). The court, thus, recognized that the framework established in *R.E.* survived *M.O.*—that many, most, in any event something less than *all*, challenges to the capacity of a proposed placement school are appropriately deferred to "a later proceeding to show that the child was denied a FAPE because the necessary services included in the IEP were not provided in practice . . . ." *R.E.*, 694 F.3d at 187 n.3.

*M.O.*'s clarification identified a narrow category of prospective challenges to a proposed placement school's capacity that were not foreclosed by *R.E.*—cases in which the placement school "cannot" implement the IEP. *M.O.* arrived at this conclusion by first acknowledging *R.E.*'s proposition that "challenges to a school district's proposed placement school must be evaluated prospectively . . . and cannot be based on mere speculation." *Id.* at 244. The *M.O.* court then held that "[w]hile it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP *cannot* be implemented at a proposed school that lacks the services required by the IEP." *Id.*

19

(internal citation omitted) (emphasis added).  Later in its decision, the *M.O.* court further emphasized the limited scope of its clarification:  "School districts do not have 'carte blanche' to assign a child to a school 'that *cannot* satisfy the IEP's requirements'. . . ."  *Id.* (internal citations omitted) (emphasis added).

"Cannot" is not a synonym for "does not," "will not," "might not," "would not," or "might have a difficult time with."  And the *M.O.* panel must have intentionally used the more concrete and limited term twice in its decision to cabin the impact of its clarification of *R.E.*  To illustrate the limitation of its holding, *M.O.* described favorably two decisions in which a court, after evaluating the particular facts at issue, concluded that the relevant IEP "*could not be*" implemented at the proposed placement school.  *Id.*  Through the repeated, purposeful use of the words "cannot" and "could not," *M.O.* opens the door to prospective challenges on the basis of concrete impossibilities, not inchoate possibilities.[6]

Moreover, "this test of a school's capacity to implement a student's IEP [ ] is limited to facts uncovered by a parent *prior to* rejecting the placement option."  *M.T. v. New York City Dep't of Educ.*, ---F. Supp. 3d---, 2016 WL 1072491, at *9 (S.D.N.Y. Feb. 26, 2016).  "It does not permit litigants to establish a substantive violation based on facts discovered for the first time at an IHO hearing."  *Id.* (citing *R.E.* 694 F.3d at 187).  *M.O.* also held that parents may not make "substantive attacks" on an IEP by "couch[ing] [the attacks] as challenges to the adequacy" of the placement

---

[6]  The cases cited with approval by *M.O.* involved (1) a proposed placement that was not seafood free was unable to provide the child—whose life-threatening seafood allergy was triggered not only be ingesting seafood, but also by skin exposure or aerosol exposure (by smell)—with a seafood-free environment as mandated in the IEP, and (2) a proposed placement that, by district policy, provided only in-class group occupational therapy, when the IEP at issue recommended one on one therapy outside the classroom.  *M.O.* at 244 (citing *B.R. ex rel. K.O. v. New York City Dep't of Educ.*, 910 F. Supp. 2d 670, 676-79 (2d Cir. 2012) and *D.C. ex rel. E.B. v. New York City Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013)).  Judge Caproni has described other circumstances that might support a successful prospective challenge—if the facts of the particular situation demonstrated that the IEP could not be implemented—to include a recommended placement for a wheelchair-bound student in a multi-level school that lacked elevators or ramps, or a recommended placement for a mentally disabled child in a school that only serves academically gifted students.  *Q.W.H. v. New York City Dep't of Educ.*, No. 15-cv-1876-VEC, 2016 WL 916422, at *8 n.16 (S.D.N.Y. Mar. 7, 2016).

school.  793 F.3d at 245.[7]  In order to award reimbursement based on a prospective challenge to a recommended placement school, therefore, there must be sufficient evidence—of facts available at the time of the parents' unilateral decision—for the IHO (or SRO, or district court) "to find that an IEP *cannot* be implemented at [the] proposed school."  *M.O.* at 244 (emphasis supplied).

Because *M.O.* is a significant development in the law since the SRO rendered his decision, and because the SRO did not articulate his analysis in reaching his alternative conclusion that PS 35 was an appropriate placement—although he was confronted with the same arguments and reached a conclusion the Court ultimately agrees with—the Court conducts a *de novo* review on the appropriateness of the proposed placement.  *Q.W.H. v. New York City Dep't of Educ.*, No. 15-cv-1876-VEC, 2016 WL 916422, at *9 (S.D.N.Y. Mar. 7, 2016).  After conducting its own independent analysis, the Court concludes that none of the Parents' concerns clear the high bar set by *R.E.* and *M.O.* for reimbursement based on a prospective challenge.[8]  The Parents' concerns regarding PS 35 can be grouped into three categories:  (1) concerns about PS 35 in general, including its size, security procedures, and student population; (2) concerns about the class H.T. would have been placed in within PS 35; and (3) concerns regarding whether H.T. would receive the related services mandated in her IEP.

---

[7]  *M.O.*'s clarification has left some points unclear.  The first question is which actor in the system can conclude that a proposed placement school cannot implement the IEP.  *M.O.* states repeatedly that "it is not speculative" "to find" or "to conclude" that a placement school cannot implement an IEP, but the relevant language in the decision does not use nouns to describe who is doing the "finding" and "concluding."  The Court assumes that it must be the IHO (or SRO, or district court) because to conclude otherwise would allow parents to refuse public school placements on the strength of their subjective conclusions alone.  In addition, the Court notes that courts of this district seem to already disagree on a second question:  which party, in a prospective placement challenge, bears the burden of proving that the proposed placement school was (or was not) capable of implementing the IEP?  *Compare Q.W.H.*, 2016 WL 916422, at *8 ("M.O. also clarifies who bears the burden of showing that the proposed placement has the capacity to implement the student's IEP.  If a student's IEP is substantively adequate, it is incumbent upon the parents to adduce some evidence that the school district would not have adhered to the IEP.") (citations omitted) *with W.W. v. New York City Dep't of Educ.*, ---F. Supp. 3d---, 2016 WL 502025, at *7 (S.D.N.Y. Feb. 8, 2016) ("M.O. leads to two conclusions . . . [s]econd, the school district bears the burden of showing that the proposed placement school has the capacity to implement the child's IEP.") (citation omitted).  The Court need not reach this issue here, because it would find that H.T. was offered a FAPE regardless of the party bearing the burden of proof.
[8]  Indeed, the language in the Parents' brief, in which they describe their "serious concerns" about PS 35 and assert that the evidence "call[ed] into question" whether H.T. would receive her mandated related services admits as much.  M.T. Br. at 23-24.  "Concerns" and "questions," even if serious in the eyes of a concerned parent, do not meet *M.O.'s* standard by themselves.

The Parents' concerns regarding PS 35 generally are, just as in *M.O.*, impermissible substantive attacks on the IEP couched as attacks on the proposed placement school.  *See* 793 F.3d at 245 (disallowing challenges related to "the appropriateness of the IEP's substantive recommendations").  In her June 21, 2010 letter to the CSE rejecting the proposed placement, M.T. expressed misgivings about the size of PS 35, the student body's behavioral issues, and the security procedures in place for the beginning of the school day.  MT1278-80.  According to M.T., these aspects of PS 35 would exacerbate H.T.'s anxiety and could make it more difficult for her to remain regulated.  M.T. also expressed concern that the school lacked a sensory gym.  *Id.*  These concerns, while understandable, do "not relate to whether the school could implement the IEP."  *J.M. v. New York City Dep't of Educ.*, No. 14-cv-9424-ER, 2015 WL 7288647, at *10 (S.D.N.Y. Nov. 17, 2015) (concerns that a school was too large or too loud were impermissibly speculative).  The IEP mandates access to sensory materials and a quiet place to calm down—it does not mandate a school of a specific size, or with alternative security procedures, or access to a sensory gym.

The Parents' next set of concerns, related to H.T.'s classroom placement within PS 35, have evolved over the course of this litigation.  In her June 2010 letter, M.T. stated that she had been able to observe the 8:1:1 class at PS 35, but she requested information regarding the other children who would be enrolled in class for the summer session and for the start of the 10-month school year in September, and information about the teacher's credentials.  MT1279.  She reiterated those requests in an October 5, 2010 letter sent after her second visit to PS 35.  MT 1276.  Before this Court, the Parents argue based on testimony from the impartial hearing that the class would not have offered H.T. similarly-functioning peers and that the DOE failed to establish that there was a seat for H.T. in that particular 8:1:1 class.  M.T. Br. at 23-24.  At the same time that the Parents' argue that the 8:1:1 class defended at the hearing was inappropriate, they also complain that the FNR did not identify this class as the specific class recommended for H.T.  M.T. Br. at 13.

The Parents' conflicting arguments demonstrate perfectly why not all speculative arguments regarding recommended placements are permissible.  There was one 8:1:1 summer class at PS 35 in 2010, and two ninth grade 8:1:1 classes beginning in September.  MT0163-64, 501.  There is no way for the Court, or H.T.'s parents, to know which of the two classes she would have been placed in for the 2010-2011 school year.  Although Mr. Yearwood, who taught one of the two classes, testified during the impartial hearing, it is within the realm of possibility that H.T. would have ended up in the other 8:1:1 class had she attended PS 35.  Furthermore, after reviewing the record, the Court cannot conclude that Mr. Yearwood's class would have been inappropriate—it appears that H.T. was similar to the other students both academically (although she would have been at the lower end of the classroom's academic range) and socially/emotionally (although her diagnoses were not identical to the other students).  MT0467-68, 473, 477.

All of this, however, is ultimately irrelevant speculation that cannot form the basis for a valid prospective challenge.  At the time of the unilateral placement decision, "the Department cannot guarantee [ ] a particular teacher" because that teacher might quit or become unavailable for the upcoming school year.  *R.E.*, 694 F.3d at 187.  Similarly, the composition of the class may change depending on fluctuations in enrollment, and on other parents of students with IEPs who are making their own placement decisions.  Just as the DOE cannot retrospectively defend an IEP by claiming that a student would have been taught by a particular teacher, *see id.*, a parent cannot retrospectively attack a placement in a particular classroom based on information that was unavailable to the parent at the time of the decision.  *M.T. v. New York City Dep't of Educ.*, ---F. Supp. 3d---, 2016 WL 1072491, at *9 (S.D.N.Y. Feb. 26, 2016) (parents may not bring claims based on "evidence not available at the time of their placement decision," such as testimony elicited before the IHO, because such claims violate *R.E.*'s proscription against later developed evidence).[9]

---

[9] For this reason, the IHO's reliance on Mr. Yearwood's testimony was misplaced.  MT0046.

Finally, the Parents' concern regarding whether the IEP-mandated related services would actually have been made available to H.T. are unavailing.  The Parents do not suggest, nor could they on this record, that PS 35 was *incapable* of implementing the 2010-2011 IEP.  Instead, they argue that "the record is uncertain" as to whether a paraprofessional would have been provided for H.T. because during one of M.T.'s visits to PS 35 she was told that the "school discourages one-on-one paras."  M.T. Reply Br. at 14; MT1276.  The Parents also rely on the fact that M.T. was told that there was no occupational therapist on site, that the school had not met all of its students' needs for occupational therapy the previous year, and that the school's speech therapist was about to retire and the replacement had not yet been hired in June of 2010.  M.T. Br. at 7.

The Parents' argument regarding related services fails.  Nothing in the record suggests that PS 35 was "factually incapable" of providing the IEP-mandated services.  *See S.E. v. City of New York Dep't of Educ.*, 113 F. Supp. 3d 695, 711 (S.D.N.Y. 2015) (denying reimbursement where plaintiff failed to offer "hard evidence" that placement was "factually incapable" of implementing IEP); *J.D. v. New York City Dep't of Educ.*, No. 14-cv-9424-ER, 2015 WL 7288647, at *16 (S.D.N.Y. Nov. 17, 2015) ("Plaintiff's own testimony that MS 326 officials made comments to her indicating an inability to effectively serve A.P. do not come close to proving that the school was 'factually incapable' of implementing the IEP, and was thus properly excluded from consideration by the SRO."); *see also Y.F. v. New York City Dep't of Educ.*, No. 15-cv-6322-LGS, 2015 WL 4622500, at *6 (S.D.N.Y. July 31, 2015) ("the fact that [a] placement had not always delivered all required special education services to its students does not establish that the placement could not provide the required services to [this student].").  To the contrary, during the impartial hearing DOE presented evidence that PS 35 did have speech therapy during the 2010-2011 school year, that it provided related service authorizations when the school could not provide the services itself, and that the school could and would accommodate a need for a dedicated occupational therapy space.  MT403-406, 419; *see also H.C. v. New York City Dep't of Educ.*, No. 14-cv-1927-AKH, 2015 WL 1782742, at * 5 (S.D.N.Y. Apr.

9, 2015) ("Under New York Law, the DOE is expressly permitted to provide related services through independent contractors") (citations omitted).

On the record before the Court, it would be impermissibly speculative to conclude that H.T. would not have received the IEP-mandated services had she attended PS 35.  The record shows that PS 35 could have provided the requisite services, which is all that is necessary to defeat a prospective challenge.

## IV.  Conclusion

The Court empathizes with the Parents, and their desire for the best education possible for their child.  But the law mandates a free appropriate public education; it does not promise an education of the Parents' choosing.  In this case, the DOE met its burden of establishing that it offered H.T. a FAPE for the 2010-2011 school year.  For the reasons explained above, the DOE's motion for summary judgment is GRANTED and the Parents' motion for summary judgment is DENIED.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:  March 29, 2016
New York, New York

_____
GREGORY H. WOODS
United States District Judge